**BOARD OF COUNTY SUPERVISORS OF the COUNTY OF HENRICO, VIRGINIA, Appellee,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation, Appellant.**

No. 73-1020.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1973.

Decided April 9, 1974.

Aubrey R. Bowles, Jr., and Aubrey R. Bowles, III, Richmond, Va., for appellant.

Robert L. Dolbeare, Asst. County Atty., for County of Henrico (J. Mercer White, Jr., County Atty. for the County of Henrico, on brief), for appellee.

Before BOREMAN, Senior Circuit Judge, and RUSSELL and FIELD, Circuit Judges.

BOREMAN, Senior Circuit Judge:

Presented for determination here is the question of liability of Insurance Company of North America (hereafter INA) as surety on a bond in the amount of $40,200 executed by Commonwealth Sand & Gravel Corp. (hereafter Commonwealth), a Virginia corporation, as principal. This bond, in which the County of Henrico, Virginia, is the protected beneficiary, will be hereinafter explained and discussed in some detail.

In 1963 and 1964 Henrico Materials Corporation was the owner of a large tract of land in Henrico County, Virginia, including two parcels between Varina and Strath Roads designated on county records as Nos. 33–A1–1 and 25–A2–8, containing approximately 40.2 acres.[1] With consent of Henrico Materials, Commonwealth applied to Henrico County (hereafter County) on April 12, 1963, for a "use permit" to extract and remove materials, principally sand and gravel, from those two parcels of land. County granted a permit on May 23, 1963, on terms and conditions prescribed

1. Parcel No. 33–A1–1 was redesignated on county records as No. 25–A2–9 and both designations refer to the same parcel of land. Both parcels were in a conveyance of the large tract by deed dated June 1, 1964, and recorded August 11, 1964, from Henrico Materials Corporation to Commonwealth. This change of designation results in some confusion to anyone who undertakes to examine the record of the proceedings in the district court.

by County Ordinance No. 179 and conditions set forth in a letter of May 24, 1963, to Commonwealth from County Planning Director of the Board of Zoning Appeals, W. F. LaVecchia. This Use Permit (UP) was designated and thereafter referred to as UP 26–63. The bond dated the 17th day of June, 1964, and executed as of that date by Commonwealth as principal and INA as surety is reproduced in full in the margin except the closing paragraph of no pertinence and signatures.[2]

The County Ordinance 179, incorporated in the bond permitted sand and gravel operations as conditional uses in Agricultural Districts in Henrico County. Each UP was handled on a case-by-case basis by the Board of Zoning Appeals and was granted only after a public hearing following newspaper advertisements.

This case was heard by the district court without a jury and the court made certain findings from the stipulations of the parties and the evidence adduced at trial. With respect to the conditions imposed upon Commonwealth by the Board of Zoning Appeals in connection with the issuance of UP 26–63 the court stated:

The defendant insurance company agreed with its principal to be bound unto the County in the sum of $40,200.00 conditioned on its principal (Commonwealth) performing and fulfilling "all of the terms of Henrico County Ordinance No. 179, as amended, and shall well and truly perform and fulfill all of the conditions imposed upon principal (Commonwealth) by the Board of Zoning Appeals at a meeting of said Board held on May 23, 1963  .  .  .  and any extension thereof that may be granted by said Board, with or without notice, to the Surety.  .  .  ."

On May 23, 1963, the County issued Use Permit No. 26–63 for the removal

2. Sand And Gravel Bond Form

KNOW ALL MEN BY THESE PRESENTS, That we, Commonwealth Sand & Gravel Corp., Principal, and Insurance Company of North America, a corporation duly incorporated under the laws of the State of Pennsylvania, Surety, are held and firmly bound unto the County of Henrico in the full and just sum of Forty Thousand Two Hundred and 00/100 Dollars ($40,200.00), current money of the United States, to be paid to the said County of Henrico, to the payment whereof we hereby bind ourselves and each of us, our and each of our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents, sealed with our seals and dated this 17th day of June, 1964.

WHEREAS, the Principal desires to extract sand and gravel on a piece of land located between Varina and Strath Roads, in Varina District, and designated as Parcel No. 33–A1–1 and 25–A2–8, on the records in the Assessment Office of the Henrico County Finance Department; and

WHEREAS, the PRINCIPAL desires to obtain from the Board of Zoning Appeals a use permit pursuant to the terms of County Ordinance No. 179 and any amendments thereto, and in order to obtain said use permit, said PRINCIPAL must have complied with all of the terms and provisions of said ordinance.

NOW, THEREFORE, the condition of this obligation is such that if the PRINCIPAL shall well and truly perform and fulfill all of the terms of Henrico County Ordinance No. 179, as amended, and shall well and truly perform and fulfill all of the conditions imposed upon PRINCIPAL by the Board of Zoning Appeals at a meeting of said Board held May 23, 1963, a copy of said conditions being hereunto attached, and any extension thereof that may be granted by said Board, with or without notice, to the SURETY, then this obligation to be void, otherwise it shall remain in full force and effect.

The SURETY shall have the right to terminate its obligation hereunder by giving to the PRINCIPAL and to the County of Henrico a notice in writing sixty days in advance of such termination, provided such notice to terminate is served upon the PRINCIPAL and upon the County of Henrico in the manner prescribed by law for the service of a notice. This provision, however, shall not operate to relieve, release, or discharge the SURETY from any liability already accrued or which shall accrue, before the expiration of the sixty day period, and the SURETY shall remain fully bound unto the County of Henrico under the conditions imposed upon the PRINCIPAL by the Board of Zoning Appeals relating to such a termination by the SURETY.

of sand and gravel to Commonwealth containing amongst other conditions, the following:

9. The conditions of Use Permit 26–63 issued Commonwealth Sand & Gravel by the Board of Zoning Appeals on May 23, 1963, include:

9. Excavation operations shall be discontinued on said site by May 31, 1964 and restoration accomplished by not later than May 31, 1965, unless a new permit is applied for by no later than 60 days before the expiration of the permit and is subsequently granted.

.   .   .   .   .   .

11. Topsoil is not removed from the area without the bounds of the area proposed to be used for operations set forth in the application.

The overburden shall be stockpiled within the area of proposed operations. Sufficient arable soil shall be set aside for respreading in accordance with the approved rehabilitation plan in a layer six (6) inches thick or the original thickness of the earth cover, whichever is less, capable of supporting vegetation.

.   .   .   .   .   .

13. That a suitable completion bond, with surety satisfactory to the Commonwealth's Attorney   .   .   . be posted with the Secretary of the Board of Zoning Appeals   .   .   . guaranteeing that the land will be restored to a reasonable level and drainable condition with a minimum slope on the restored property being five to one or flatter.

These conditions as recited by the district court were among those contained in the letter to Commonwealth of May 24, 1963, from County Planning Director, Mr. LaVecchia, reference to said letter having been made above.

Now begins a story or recital of facts, almost unbelievable, of negligent inattention, bumbling, and gross disregard, by both Commonwealth and County, of the objectives sought to be obtained by the grant of a use permit and the bonded protection theoretically to be provided in connection with such permit. We are compelled to take a close look at the procedures and happenings in the instant case.

UP 26–63 was issued to Commonwealth on May 23, 1963, which, by its terms, expired on May 23, 1964. No sand and gravel operations were conducted by Commonwealth during the specified term of the permit; it was not renewed and no application was made for a new permit "no later than 60 days" prior to its expiration date. Yet the bond here in controversy was not executed until June 17, 1964, obviously after this permit had expired.[3]

3. Ordinance No. 179, adopted by the Board of Supervisors of County, effective January 1, 1960, related, among other things, to sand, gravel, or clay pits, quarries and mines and the extraction of material therefrom providing in part as follows:

17.86—A plan of operation shall be submitted to and approved by the Board of Zoning Appeals which shall provide in all respects for the adequate safeguarding and protection of other nearby interests and the general public health, safety, convenience, prosperity and welfare, and which shall include a satisfactory plan and program showing, *by contour maps and otherwise,* how the land is to be restored to a safe, stable and usable condition by regrading, draining, planting, or other suitable treatment so that it will resist erosion and conform substantially with adjacent land characteristics.

17.87—*Whenever the special use permit issued by the Board of Zoning Appeals shall have expired, or whenever the operations shall have ceased for any period exceeding 12 consecutive months, then all plants, buildings, structures (except fences), stockpiles and equipment shall be entirely removed from the premises, and the premises shall be restored as required by Subsection 17.86 above.*

17.88—A bond or other suitable guarantee shall be furnished prior to undertaking any work under the permit guaranteeing the faithful performance of all of the applicable requirements in this Ordinance.

17.89—The Board of Zoning Appeals may renew a permit, after a public hearing, *provided an application therefor is filed within 60 days before its expiration date, in the same manner as for an original permit, provided the applicant is carrying out the requirements of his existing permit in good faith.* (Emphasis supplied.)

Pursuant to 17.86 of Ordinance 179, a "plan and program showing, by contour maps and otherwise, how the land is to be restored to a safe, stable and usable condition by regrading, draining, planting, or other suitable treatment so that it will resist erosion and conform substantially with adjacent land characteristics" were supplied in connection with the application for UP 26–63. Filed with Commonwealth's application were two plats prepared by Civil Engineers showing respectively the boundaries, the existing contour topography of the parcels of land and water courses thereon and the other proposed general plan for rehabilitation of the area by Commonwealth after the mining conducted thereon pursuant to said UP which was granted in response to the application therefor. Other conditions set forth in Mr. LaVecchia's letter of May 24, 1963, as recited in the district court's opinion, were:

"Excavation operations shall be discontinued on said site by May 31, 1964, and restoration accomplished not later than May 31, 1965, unless a new permit is applied for by no later than 60 days before the expiration of the permit and is subsequently granted and that a suitable completion bond with approved surety be posted 'guaranteeing that the land will be restored to a reasonable level and drainable condition' and with the right of cancellation by the surety on 60 days notice."

On June 12, 1964, Commonwealth made application to County for a Conditional UP to extract materials from the two parcels covered by UP 26–63. Filed with this later application were the same plats as filed with the application for UP 26–63. The Board of Zoning

Appeals held meetings on said application and the minutes of a meeting on August 27, 1964, show that Mr. E. M. Twohy appeared on behalf of Henrico Materials Corporation and that Conditional UP 57–64 was granted on August 27, 1964, subject to the conditions of Ordinance No. 179 and other conditions as set forth in a letter from Mr. LaVecchia dated August 28, 1964. Further conditions of UP 57–64 were that excavation operations should be discontinued on said site by May 31, 1965, and restoration accomplished by not later than May 31, 1966, unless a new permit is applied for by no later than 60 days before the expiration of this permit and is subsequently granted. The giving of a completion bond with approved surety "guaranteeing that the land will be restored to a reasonable level and drainable condition and with the right of cancellation on 60 days notice" was also a condition of UP 57–64.

Notwithstanding the provisions and conditions of UP 57–64, Commonwealth, on July 12, 1965, filed another application for a Conditional Use Permit to extract materials from the same two parcels which were covered by the two earlier UPs. Filed with this application were the same plats as those filed with the applications for UPs 26–63 and 57–64.[4]

At its meeting on December 2, 1965, the Board of Zoning Appeals granted Conditional UP 93–65 subject to the conditions of Ordinance No. 179 and other conditions set forth in a letter from Mr. LaVecchia dated December 6, 1965. By this later permit excavation operations were to be discontinued on said site by December 1, 1966, and restoration accomplished by not later than December 1, 1967, unless a new permit should be

---

4. However, the Board of Zoning Appeals had held a meeting on November 19, 1964, the minutes of which show that pursuant to notice of November 10, 1964, to E. M. Twohy of Henrico Materials Corporation he was requested to show cause why his use permit should not be revoked for failure to maintain the public road and remove clay and dust

therefrom pursuant to the provisions of Ordinance No. 179. The minutes further disclose that a pond on the property is required by the State Water Control Board and that the permit holder's water plans have to be inspected and approved monthly. It appears that the use permit was not revoked.

applied for by no later than 60 days prior to the expiration of the permit and was subsequently granted. The same provision with reference to the giving of a completion bond with approved surety as noted in the conditions imposed in connection with the prior use permits was made a condition of UP 93–65.

Notwithstanding that excavations were thereafter made by Commonwealth on said parcels until April 1, 1970, no other UPs were thereafter granted. On February 11, 1970, Commonwealth had filed a petition in bankruptcy and was thereafter adjudicated a bankrupt. On February 20, 1970, County notified Commonwealth to cease all activity on the property and on May 29, 1970, Henrico County Planning Administration called on INA as surety to perform the obligations of Commonwealth under Use Permits 26–63, 57–64 and 93–65.

One A. E. Clarke referred to as "Planner II" was the individual designated by County to inspect Commonwealth's operations pursuant to permits 26–63, 57–64 and 94–65 and inspections thereof were made by him at semimonthly and monthly intervals during the period from May 23, 1963, until the bankruptcy and cessation of operations by Commonwealth in 1970. County was fully advised and at all times knew from such actual inspections the nature, extent and character of Commonwealth's operations on the property and the nature of its failure to comply with its operations in that regard. It appears clearly from the record that it was not known and could not be established from any available source what excavation was made at any location on the property at any period of time or pursuant to any specific use permit, and it could not be shown what or when any reclamation was accomplished at any particular place. No notice of any kind was given to INA at any time prior to Commonwealth's bankruptcy of any default of Commonwealth with respect to any obligation the performance of which is claimed to have been guaranteed by the bond here in question until formal demand by letter of May 29, 1970, to E. W. Hallman of INA, calling on INA to proceed immediately "to perform the necessary rehabilitation *on all of the land disturbed by Commonwealth* during its operations." (Emphasis supplied.)

On July 1, 1970, all of the property in the area between Varina and Strath Roads owned by Commonwealth, including the two parcels hereinbefore noted, was conveyed by the Trustee in Bankruptcy to Edward E. West and others and on June 25, 1970, the Board of Zoning Appeals granted to West Sand and Gravel Co., Inc., UP 29–70 pursuant to its application therefor dated June 3, 1970, the conditions of which are set forth in a letter from Mr. LaVecchia to E. E. West, Jr. Subsequently, on May 27, 1971, West Sand and Gravel Co. was granted another UP No. 40–71 pursuant to its application therefor dated May 3, 1971, the conditions of which are set forth in a letter from Mr. LaVecchia to E. E. West, Jr., dated May 28, 1971.

West Sand and Gravel filed with its application for each UP 29–70 and 40–71 a plat dated June 24, 1970, made by certified surveyors which purported to show as to each application therefor "the boundary limits and current field topography (including locations of water courses and buildings) of the part of such tract that is proposed to be used for the operations set forth in the application" and "a general plan for proposed rehabilitation of the area on which the proposed operations are to be conducted indicating thereon the proposed final contours and the scheduling of rehabilitation measures in relation to the sequence of operations." The Board of Zoning Appeals approved and accepted said plan showing a plan of rehabilitation for the entire area, *including the two parcels hereinbefore described,* altogether different from and completely inconsistent with the plan of rehabilitation disclosed by the plans filed by Commonwealth with its respective earlier applications for UPs. Said applications by West Sand and Gravel filed in connection with UPs 29–70 and 40–71 disclosed

the intention to use "existing haul roads" and "existing haul road to Strath Road" which said use was approved by the granting of said permits.

Returning for a moment to another important development in connection with Commonwealth's operations it is noted that E. M. Twohy, an officer and representative of Commonwealth, applied to the County Board of Zoning Appeals in April of 1966 for a Conditional Use Permit as required by Section 7.212 of the Zoning Ordinance to construct and operate a processing plant on the two parcels hereinbefore described and identified. At a meeting of the Board in May 1966 Mr. Clarke, Planner, pointed out to the Board on a county map the location of the property on which the processing plant would be constructed. The Board granted the application for the Conditional Use Permit to construct and operate the processing plant under certain stated conditions which were made subject to amendment at any time. This permit was designated UP 22–66.

Following the sale and conveyance by the Referee in Bankruptcy to West, including the processing plant, West Sand and Gravel was granted a use permit to continue the operation of the processing plant with the operation of lakes, water catch basins, roads and appurtenances which were established in connection with and necessary to the operation of the processing plant. UP 22–66 to Commonwealth specified that no material should be processed at the plant except that mined from the two parcels involved herein. However, it was disclosed by the evidence that Commonwealth had excavated and mined materials on lands not included in these parcels covered by its UPs and had been processing that material at the processing plant in addition to the material mined from the two designated parcels.

There are other facts and circumstances which are not to be ignored or disregarded. When Commonwealth applied for its second UP (57–64) the application form was the same as the one used in connection with the earlier grant

of UP 26–63. Commonwealth proposed to mine on two identified parcels comprising 40.2 acres in the north central part of a tract containing 469 acres. Commonwealth stated at that time it proposed to locate on the mining area site "a power substation, gravel processing plant, all cleared, however, through County planning and zoning and building permit section."

Referring to the bond requirement Commonwealth stated:

The applicant proposes to use the following as surety on his bond.

Henderson & Phillips, Inc., 1104 National Bank of Commerce Bldg., Norfolk, Va.

On June 15, 1964, Mr. Robinson of Henderson & Phillips applied to the Bond Department of INA for two bonds for Commonwealth, "one for $40,200 which will possibly remain in existence for many years to come." On June 16, 1964, an inter-office memorandum was sent to INA from Henderson & Phillips which included the May 24, 1963, letter of Board of Zoning Appeals Director of Planning, Mr. LaVecchia, in connection with the grant of the first UP (26–63). Concerning the conditions the broker stated:

Although under condition No. 9 operations should have been discontinued May 31, 1964, they have not yet started. This is the property for which $40,200 bond is required so they can get started.

The formal bond application was presented by Commonwealth stating the bond was to be written from June 17, 1964, for an indefinite term. Commonwealth commenced mining operations in August 1964 and there had been no mining on the site prior to that time.

Under Ordinance 179 the deadline for Commonwealth's completion of rehabilitation could occur in either of two ways —one year from expiration date of the use permit or one year from cessation of operations. The UP was revocable for cause and no specific time period was provided for completion where the oper-

ation was shut down when a permit was revoked. Neither the bond, the permit, nor the Ordinance provide for specific notice to the surety except the conditions imposed could be extended by the Board of Zoning Appeals "with or without notice to the Surety."

UP 93–65 was granted to Commonwealth on December 1, 1965, to expire on December 1, 1966, with restoration to be completed by December 1, 1967. The application also listed Henderson & Phillips "as surety on his bond."

Under item 13 in the application for the last UP the possibility of a plant was also mentioned "if suitable zoning can be obtained, a processing plant will be erected." No further mining UPs were applied for or obtained by Commonwealth from that time forward during its operations which continued for a period of some weeks after bankruptcy by arrangement with the bankruptcy court. Thus, operations continued during the years 1967, 1968, 1969, and well into the year 1970 without any Use Permit, contrary to the explicit terms and provisions of UP 93–65.

It is undisputed that Commonwealth continued its mining operations far beyond the limits of the area covered by any Use Permit. Mr. Twohy, Commonwealth's vice-president and Operations Supervisor, could not state what he mined in any particular period and company records were no longer available to make that determination. Mr. Clarke, County's Planner and Inspector, stated: "I would hazard a guess that they mined the 40 acres, 40.2 acres in about the first three years." It was the County's estimate that approximately 90 acres had been mined or disturbed by Commonwealth which would be about 50 acres more than the acreage covered by any UP issued to Commonwealth.

According to Mr. Clarke it was not until July or August 1969 that he discovered that Commonwealth had no current UP. A number of telephone calls back and forth resulted in an attempt by Commonwealth to apply for a UP in November 1969. At that point Clarke knew that Commonwealth had gone far beyond the boundaries of the lands indicated in the permits and he told Commonwealth that the plats being provided at that time were not adequate to "show what the conditions at the property were and what the situation was," advising against filing an application unless there were more complete plats furnished.

It appears that INA provided some unidentified type of insurance on the processing plant through May 1970, one three-year policy from May 1, 1966, and a one-year policy from May 1, 1969. The policies and all INA correspondence relating thereto had been destroyed but a file card showed that the insurance had been obtained through Henderson & Phillips.

Some time in 1965 INA contacted Henderson & Phillips concerning the bond in controversy, stating that a premium was due to cover the period through June 17, 1966, and asking advice whether the bond was to be continued. The same procedures were thereafter followed concerning the continuation of the bond covering one-year periods through June 1970. County asserts in its brief:

> The broker probably paid these premiums to INA. In any event, when Commonwealth went bankrupt, Henderson & Phillips filed a substantial proof of claim for insurance premiums. None of these premiums were refunded, the bond was never revoked or rescinded by INA.

It may be noted that this case was originally instituted in a Virginia state court but was properly removed to the federal district court by INA. In its initial pleading County alleged as follows:

> In October 1967, representatives of the County of Henrico notified Edward M. Twohy of Commonwealth Sand & Gravel that reclamation and rehabilitation of the property was inadequate, and Mr. Twohy agreed that Commonwealth Sand & Gravel would take necessary steps to correct the situation.

During the period October 1967 to May 1969, representatives of the County of Henrico made periodic inspections on the premises (as they had done since Commonwealth Sand & Gravel's operation began) and had consultations with Mr. Twohy concerning Commonwealth Sand & Gravel's operation, including the need for adequate reclamation and rehabilitation, and each time Mr. Twohy agreed to take the necessary steps to correct the situation.

County further alleged that in May and August 1969 Mr. Twohy was notified by representatives of County that his Use Permit had not been renewed since December 1, 1966.

Despite the asserted and confessed knowledge by County and its representatives of the nature and extent of Commonwealth's operations, its dereliction, its failure to pursue required rehabilitation procedures, its open violations of the terms and conditions of its Use Permit and the provisions of Ordinance 179, County permitted Commonwealth to continue operations without interference until its bankruptcy, obviously knowing full well the constantly worsening conditions of the affected property and knowing that the possibility or probability of rehabilitation by Commonwealth was steadily diminishing to and beyond "the point of no return."

If there be any doubt as to the property covered by the Use Permits granted to West Sand and Gravel Co., Inc., the purchaser of the large tract of land owned by Commonwealth consisting of nearly 500 acres, of which the two parcels here involved were a part, it is only necessary to refer to West's application for UP 29–70 and UP 40–71 together with the permits themselves as issued. The application for UP 29–70 was filed on June 3, 1970, and is a "Request for use permit to extract materials from Parcel No. 25–A2–8 and 25–A2–9." [5] The permit, issued in due course, granted to West a conditional, nontransferable Use Permit, revocable for cause, to extract materials from "Parcels 25–A2–8 and 9, located on Strath Road." In West's application for its second permit, UP 40–71, the request was exactly the same and the permit granted by the Board of Zoning Appeals used the same description as to the lands to be affected except that UP 40–71 described the parcels as located between Strath and Varina Roads. As has been hereinbefore noted West purchased the processing plant on the same parcels of land and obtained the right to maintain and operate the same by virtue of a UP.

The district court filed its Memorandum on September 18, 1972, and it appears to be unreported. Therefore it is deemed advisable to quote from certain portions of the court's opinion as follows:

> Defendant also contends that plaintiff allowed Commonwealth to continue its excavation operations without any use permit and is therefore precluded from recovery. Since such conduct was unlawful, it was of course a departure by Commonwealth from its agreed performance. The fact of departure, however, is not in and of itself sufficient to insulate defendant from liability. The general rule is a surety may be relieved of its obligation to its beneficiary when the beneficiary has allowed the principal to depart from its agreed performance. See 50 Am.Jur., *Suretyship*, § 159. In the case of a paid surety, as here, however, a departure must be such as to prejudice the surety, e. g., Peachtree Roxboro Corp. v. United States Cas. Co., 101 Ga.App. 340, 114 S.E.2d 49 (1960), or at least be material to the contract. Moreover, the beneficiary must bind itself to the deviations before the surety is released. A mere forbearance in enforcing performance is not sufficient. See, Phoenix Ins. Co. v. Lester Bros. Co., 203 Va. 802, 127 S.E.2d 432 (1962).

5. As shown in note 1, supra, Parcel No. 33–A1–1 is the same parcel as No. 25–A2–9.

On the facts before it, the Court finds that Commonwealth's failure to secure use permits was neither a material nor prejudicial breach and that Henrico County in no way agreed to the continued excavation without a permit. The existence *vel non* of use permits in no way affected the type of performance that was expected of Commonwealth. It was still bound to reclaim the land according to plans approved by the County. If any party was hurt by the failure to secure use permits, it was the County, not defendant.

Even if the failure to secure use permits was a material deviation from Commonwealth's agreed performance, it is clear that the County did not agree to such a deviation. The County did refrain from ordering Commonwealth to cease work. However, such forbearance does not rise to the level of commitment to the deviation. At the worst it indicates only that the County did not feel injured by Commonwealth's failure to secure permits.

The final defense turns on the fact that, subsequent to its demand for performance upon the defendant, the County allowed another use permit to issue. Defendant claims that this use permit allowed a plan of reclamation inconsistent with the one approved for Commonwealth. Accordingly, defendant argues, the County has now rendered it impossible for defendant to carry out the agreed reclamation.

The Court has serious doubts as to whether this bond was in fact a performance bond which gave the defendant the right to attempt to complete performance before demand could be made upon it for the $40,200.00. Bonds secured in order to obtain legislative permits may well be more penal in nature than performance oriented.

In any event, however, the Court finds that the operations conducted by West, to whom defendant is referring, were not such as to interfere with reclamation by defendant according to the agreed upon plan. The County,

therefore, in issuing the later use permits, did not render impossible performance by defendant.

The court then held that the amount of $1,000 per acre as provided in the bond was liquidated damages and that the County was entitled to recover the full $40,200 without a showing of particularized damages. Subsequently, by motion, it was called to the court's attention that certain portions of the acreage involved had been rehabilitated and the court amended its order reducing the amount of the judgment from $40,200 to $36,200, having concluded that approximately four acres had been reclaimed and that it was appropriate to reduce the judgment by $4,000.00.

The district court expressed "serious doubts as to whether this bond was in fact a performance bond which gave the defendant the right to attempt complete performance before demand could be made upon it for the $40,200." The court ventured the observation that *bonds secured in order to obtain legislative permits may well be more penal in nature than performance oriented.* Notwithstanding the "serious doubts" and the general observations the court failed to make a finding as to the nature of the bond; it simply stated its conclusion that the $1,000 per acre represented liquidated damages which County was entitled to recover without a showing of "particularized damages."

The obligations of Commonwealth guaranteed by INA are explicitly stated on the face of the bond. They are as follows:

1. To "well and truly perform and fulfill all of the terms of Henrico County Ordinance No. 179 as amended," and

2. To "well and truly perform and fulfill all of the conditions imposed upon Principal by the Board of Zoning Appeals at a meeting of said Board held May 23, 1963, a copy of said conditions being hereto attached, and any extension thereof that may be granted by

said Board, with or without notice to the surety."

It is important to note that the bond also expressly reserved to INA "the right to terminate its obligation hereunder by giving to the principal and to the County of Henrico a notice in writing 60 days in advance of such termination."

Ordinance 179, Commonwealth's UP 26–63, the Bond itself and the conditions specified by the Board of Zoning Appeals are the sources for ascertainment of INA's obligation. Ordinance 179 requires as a condition to the grant of any permit the submission by the applicant therefor of "a satisfactory plan and program showing by contour maps and otherwise, how the land is to be restored to a safe, stable and usable condition." Said ordinance further provides for two separate 12-month periods within which restoration of the premises shall be accomplished, i. e., whenever the special use permit shall have expired and whenever the operations shall have ceased for any period exceeding twelve consecutive months. The ordinance further provides for the furnishing of a bond or other suitable guarantee before any work is undertaken under the permit "guaranteeing the faithful performance of all the applicable requirements in this ordinance"; conferred upon the Board of Zoning Appeals were broad powers to hear and decide applications for special permits, to determine the conditions upon which they are to be granted and *to revoke the same* "at any time for failure to adhere to the applicable conditions." Each UP granted to Commonwealth beginning with UP 26–63 and the conditions stated by the Board of Zoning Appeals required the appellant to give a suitable *completion bond* in the amount of $40,200 "guaranteeing that the land will be restored" expressly subject to termination by the surety upon 60 days written notice. Contour maps showing how the land was to be restored as required by Ordinance 179 were furnished by Commonwealth with its applications and were accepted by the County.

County undertakes to suggest that the bond does not give the surety the option to rehabilitate the land or any specific time period within which to rehabilitate if the Principal is unable to accomplish rehabilitation, but it would seem pertinent, in the circumstances, to consider County's letter of May 29, 1970, to an authorized representative of INA signed by Mr. LaVecchia as follows:

Your company was the bonding agent for Commonwealth Sand and Gravel Company with respect to mining on parcels 82–A1–1 [6] and 25–A2–8, located between Strath and Varina Roads. Commonwealth Sand and Gravel has been declared bankrupt and all activities on the property have ceased. There remains a considerable area on the property that has been mined which has not been properly rehabilitated.

This letter serves as notice to your company that it should proceed immediately to make the necessary arrangements to perform the necessary rehabilitation on all the land disturbed by Commonwealth Sand and Gravel during its operations. We would expect to hear from you in the near future as to what plans and arrangements you have made to comply with this request.

Under the circumstances County was in no position to argue that INA's bond was anything other than a completion or performance bond since County expressly demanded immediate rehabilitation by INA as surety on the bond. In fact, in its brief County states that "the bond, under the ordinance and conditions, was to guarantee reclamation," but it then argues that the bond did not state who would do the reclaiming when the principal was gone and presents the argument, which was adopted by the court, that such bonds are usually considered to be penalty bonds, in which case the bond amount is a fine. The Planning Director, Mr. LaVecchia, in his letter above quoted, demanded reclamation of *all the disturbed land* when he admittedly

---

6. Six. Properly designated 33–A1–1, the same parcel later designated 25–A2–9.

then well knew that Commonwealth had mined far beyond the area limits designated in its permits.

County concedes, as it must, that Commonwealth's obligations under the ordinance could begin in two ways, one, at the expiration of the last Use Permit or, two, one year from cessation of operations. Since Mr. LaVecchia's demand to commence rehabilitation was dated May 29, 1970, stating that all activities on the property had ceased [7] it would appear obvious that County relied on the 12-month provision of the ordinance within which compliance with that demand for rehabilitation could be accomplished. Yet, in just 27 more days, on June 25, 1970, the same Mr. LaVecchia, with the Board's explicit approval, transferred the nontransferable UP 22–66 covering the processing plant to West and granted to West UP 29–70 to excavate on the same property. County also admitted that in neither the transer to West of UP 22–66 nor the grant of Use Permit 29–70 did it reserve for INA any right to go on the parcels involved in order to comply with the demand of May 29, 1970, that it accomplish reclamation or rehabilitation on that land.

All witnesses testifying in this case were those called as witnesses for County. As was earlier pointed out, Mr. Clarke, the County Planner and Inspector, was the official on whom Mr. LaVecchia relied to police this operation and Clarke stated to the best of his recollection he was not aware until 1969 that Commonwealth was operating without a permit; but Mr. Twohy, Commonwealth's officer and agent, testified, without denial, that Clarke did become aware of the fact that Commonwealth was operating without a permit quite early during the nearly four-year period in which the processing plant operated under Clarke's constant observation and surveillance. That operation began in 1966 and continued until April 1, 1970. Mr. Clarke agreed that he was definitely checking frequently during that period to obtain active performance to comply with County's requirements. It is clear that Twohy's testimony related in fact to the entire period during the time of the processing operation.

The Board itself definitely knew at its meeting on May 26, 1966, that both mining and processing operations would continue on Parcels 25–A2–8 and 25–A2–9 for quite a long time because UP 22–66 for the processing plant and operation granted to Commonwealth on that date was expressly subject to certain conditions among which were the following:

1. Only material mined from the property in question shall be processed at this plant.

2. The entrance to the plant would be from the established driveway on Strath Road which included the road on top of the dam providing the lake necessary for furnishing water to the processing plant and its operations.

County seeks to explain its conduct as passive indulgence or, at worst, as negligence. It asserts that "there is no evidence to show any reason that Commonwealth would not have received new permits had they applied in 1966–1969." But it appears this statement is inaccurate since, in fact, County relies on the contrary when it recites, for another purpose and at an incorrect point in time, that Mr. Clarke advised Mr. Twohy not to file new applications. Mr. Twohy, County's witness, said the reason for that advice was that Mr. Clarke knew that no further permit would be granted. Whether County knew, neglected to discover, or deliberately accepted the fact that material was being processed at the plant in addition to that mined from the parcels covered by Commonwealth's permit would appear to be utterly immaterial to the issue presented on this appeal. The court correctly found that "such conduct was unlawful" and that "it was of course a departure" that relieves INA if "such as to prejudice the surety." The continued mining

---

7. It was stipulated that Commonwealth mined on the property until April 1, 1970.

without a permit "made proof of [the] actual detriment impossible," as stated by the Supreme Court in American Surety Co. v. Greek Catholic Union, 284 U.S. 563, 568, 52 S.Ct. 235, 237, 76 L.Ed. 490 (1932), and produced a situation where the principal's authority was extended without the consent of the surety, as stated by this court in Fidelity & Casualty Co. v. Metal Window Products Co., 30 F.2d 56, 58 (4 Cir. 1929).

County does not attempt to deny the uncontradicted testimony of its own witnesses that it is impossible to determine by any means whatever what need for reclamation was created by excavation under Commonwealth's permits guaranteed by INA's bond and what reclamation was necessarily attributable to the mining without any permit, for the latter of which INA is admittedly not liable. County argues, and the court accepted the argument, that "no new obligation arose, and no prejudice resulted" because of the lack of permits. County's Planning Director, Mr. LaVecchia, properly conceded that the County did not allow anyone to operate without a permit and that the obligation of the surety on the bond is determined by the bond, the permit, and the ordinance. Yet County demanded, through Mr. LaVecchia's letter of May 29, 1970, rehabilitation on *all* of the land disturbed by Commonwealth *during its operations,* notwithstanding he then knew about the operation without any permit since December 1, 1966, and that mining requiring reclamation had been performed outside parcels covered by Commonwealth's permits. Thus, the mining without a permit was a change "not within the scope" of the contract guaranteed which operated to exonerate the surety from liability for the subsequent dereliction of its principal in that regard. *See* United States v. Freel, 186 U.S. 309, 317, 22 S.Ct. 875, 46 L.Ed. 1177 (1902).

Continuing the discussion, Commonwealth's UPs 26–63, 57–64 and 93–65 granted only the right to excavate sand and gravel. UP 22–66 permitting the construction of the processing plant and the processing operations themselves was granted without notice to or consent of INA. Mr. LaVecchia agreed that this represented a change in what was to be done on the land. Mr. Twohy explained clearly and in detail why the processing operation completely changed the use of these parcels of land and precluded any rehabilitation required by the previous mining thereon, testifying on direct examination:

> Once you build a sand and gravel plant you have built something that takes 4000 gallons of fresh clean gallons per—every minute you are using 4000 gallons of water. Neither Reedy Creek nor Roundabout Creek runs year round, so for all practical purposes there is no fresh water supply on this property. Therefore you must build a large reservoir to store water, certainly at least a week's supply, which can flow by gravity to your plant.

Mr. Twohy further explained that the waste from the washing process was discharged into another lake and, when settled, was pumped back up to the original storage supply. A large area was necessary for the series of dams, catch basins, and lakes necessary to prepare the water for repeated use flowing by gravity to the land;

> . . . but unless you have got these water sheds I am talking about to provide you with water to wash and grade your material, and unless you have got the suitable discharge basins to receive these washings, you can't operate the plant.

He followed up by saying that, from an operator's standpoint, there was an impossible situation created for the County "to work with under their law" and it was "equally impossible for a bonding company to see that its man performs because the plant can't operate without these areas and *not being rehabilitated.* . . ." (Emphasis added.) It was evident from his testimony that after the processing plant was built the large lakes above and below the plant were absolutely necessary to the operation. Mr.

Clarke also appears to have recognized "a set of conditions that really preclude this plan [for rehabilitation] getting done." County's own testimony shows that the granting of UP 22–66 definitely postponed and prevented reclamation of the lands in question as called for by the ordinance, the original mining permits, and INA's bond.

Again we turn our attention in greater detail to the happenings following Commonwealth's bankruptcy and to the County's participation in the developments involving West Sand and Gravel, all of which have been earlier touched upon.

County's letter to Commonwealth of February 20, 1970, commanded immediate cessation of mining that had admittedly continued for over three years without any permit whatever, both within and beyond the limits of the area of the parcels involved. County wrote a letter on March 31, 1970, to Commonwealth's counsel, with a copy to INA, complaining of the mining outside of the prescribed limits and appealing for help in the bankruptcy proceeding. It appears that both letters were prepared by Mr. Clarke since Mr. Clarke's initials were shown thereon although the letters actually bore the signature of Mr. La-Vecchia. Mr. Clarke knew all the facts unknown to INA. Neither letter referred to the processing UP 22–66 which operation had totally changed the entire situation. Yet Mr. Clarke, with all of his knowledge and information, agreed with the Referee in Bankruptcy, on behalf of County, for Commonwealth to continue its operations even after the bankruptcy adjudication.

County's first demand of INA for restoration was not until May 29, 1970, and referred particularly to the two parcels here involved. No mention whatsoever was made to the processing UP 22–66. From UPs 29–70 and 40–71, granted by County, West was clearly granted the right to extract materials from these two parcels. The transfer to West of processing UP 22–66 is clear. INA contends that the contour plats respectively delineating the rehabilitation obligations of both Commonwealth and West related to the same exact parcels of land, that is, Parcels 25–A2–8 and 9 and it would appear that this contention is well supported by the evidence.

County agreed that the "heavier broken lines" shown on a plat exhibit representing proposed contours for rehabilitation by West were a condition upon which West's mining permits were granted. Subsequently, County agreed more specifically that the plats submitted by West were in fact a condition on which West's mining permits were granted insofar as the proposed contours were located within the area in which UP 29–70 and UP 40–71 permit excavation. The respective applications for West's permits state that they do show the proposed final contours for rehabilitation. The fact that West may have "selected its 50 acres" on which to mine, if it actually did do so, would not affect County's admitted acceptance of a stipulated exhibit as the agreed basis for West's rehabilitation of Parcels 25–A2–8 and 9. Mr. Thomas, of West Sand and Gravel, testified that West definitely defined "that we wouldn't overlap" but we fail to find any support in the record showing the basis of that definition. If West's selection of 50 acres outside of Parcels 25–A2–8 and 9 resulted in processing materials not excavated therefrom then this was a violation of the express condition of UP 22–66 which was transferred by County to West.

There was shown to be a great difference between the plan of restoration agreed upon by the County and Commonwealth and that agreed upon by County and West. County conceded that West's obligation to restore "requires approximately 20 more feet of soil or fill in that area where the 40.2 acres are than was ever contemplated in the original plan." The original plan was the one guaranteed by INA. West's vice-

president, Mr. Thomas, after carefully examining certain exhibits, tacitly admitted that the contours of West's rehabilitation obligation were quite different from Commonwealth's and testified that West was, in fact, obligated to County to restore the two parcels to the condition indicated in the particular exhibit which was the contour plat for West's restoration. County's demand on INA contained in the letter of May 29, 1970, was completely circumvented by County's agreement with West.

County's position was plainly stated by Mr. LaVecchia:

> My position is that the bond [of INA] continues until the rehabilitation *for which it guarantees* is accomplished. [Emphasis added.]

Regarding that guarantee Mr. LaVecchia agreed that December 1, 1966, the expiration date of Commonwealth's last UP, was a "point at which it would trigger the obligation of INA to restore it." The obligation to restore the condition as it existed at that time until such restoration was either prevented or accomplished would justify the collection of the annual premium on the bond. But the payment of such premiums did not extend the obligation of the bond to restoration created by further mining done thereafter without surety's consent. Determination of the condition of the land requiring restoration on December 1, 1966, was rendered impossible by the continued mining and the granting of the processing UP 22–66, both without INA's consent.

The district court obviously recognized and was concerned by INA's right to be advised and consulted concerning County's decision to allow Commonwealth to continue excavation without a permit and its decision to grant UP 22–66. However, the court did not appear to allow its concern about the obligation for such notice to embrace the effect of the failure to give that notice on INA's conceded right to terminate its obligations thereunder on 60 days written notice expressly written into the bond. Had County informed INA in 1966 of its determination to change the whole operation as it did by granting the processing UP 22–66 and by allowing the mining to continue without a permit INA could then have given notice of its withdrawal from further obligation in the future. It could then have taken action to protect its interests, to fix and discharge its liabilities as they then existed, and at that time, more than three years prior to Commonwealth's bankruptcy, could have undertaken to obtain subrogation from Commonwealth.

Mr. LaVecchia testified without contradiction that County has never done any reclamation work nor has it ever obtained appraisals therefor. Under the circumstances here it is difficult to perceive how the County can be the only party hurt or disadvantaged as the court appears to assume. If the County will not use the award of $36,200 to perform Commonwealth's alleged obligation then reclamation is not accomplished and a recovery by the County is a mere cash windfall without justification of any kind. On the other hand, if County expects the reclamation to be performed by West pursuant to the latter's agreement with the County then in all equity and justice INA should be released from the terms of its performance bond.

The prejudice to INA under all these facts and circumstances as shown by the evidence is manifest. The court found that INA was not prejudiced and we conclude that this finding was clearly erroneous.

Reversed.